[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case is a breach of contract claim for damages which was tried to the court. The facts are not in dispute so that resolution of the case depends on how several questions of law are resolved.
The plaintiff Shoreline Communications entered into a license agreement with Eagle Cab Company; the agreement is dated October 20, 1997. Eagle was entitled, pursuant to the agreement, to place radio equipment on a transmitter tower owned by Shoreline. Eagle was to make monthly payments commencing November 1, 1997, and the licensing agreement ran to October 1, 2002.
On May 21, 1999, the defendant Norwich Taxi assumed the license agreement as of May 1, 1999, and the defendant made payments through and including October, 1999. The defendant failed to make the November, 1999 payment and every payment since then. The plaintiff has now brought this action for damages.
The court will reference the wording of the license agreement during its discussion of the legal issues raised, but testimony was received during the trial which the court believes has a bearing on those issues, and the court will now briefly summarize that evidence.
It came out during the trial that at about the time the defendant stopped making payments under the license agreement, the plaintiff was in the process of selling its business to another broadcasting company. Mr. Quinn, as president of the plaintiff, testified that because of the defendant's failure to keep up payments the amount of money paid by the purchaser was reduced by over $10,000. The new purchaser, Spring Broadcasting, indicated "they were not going to honor the licensing agreement." The plaintiff, therefore, is still the owner of the agreement and it had an understanding with Spring Broadcasting to allow the defendant's equipment to be on the tower — the defendant would be able to CT Page 5515 exercise its rights under the agreement if they became current to the plaintiff on their obligations under the licensing agreement. The court inquired whether the new purchaser, Spring Broadcasting, would be able to accommodate another licensee in the space on the transmitter tower reserved for the defendant and then compensate the plaintiff for the reduction in the sales price it received from Spring Broadcasting.
Mr. Quinn responded:
 "No, I guess with a 300 foot tower, there is other space to lease so if another prospective tenant had emerged, there would have been other levels on the tower that could easily have accommodated someone else probably."
The court expressed its opinion that there was to prevent Spring Broadcasting from calling the plaintiff and saying it had someone who would use the space in question and Spring Broadcasting could then reimburse the plaintiff for use of the reserved space. Quinn said there was nothing is his company's agreement with Spring Broadcasting which would prevent such a thing from happening, but consistent with his previously quoted response, Mr. Quinn stated the chances of that happening were minimal.
Mr. Knowles testified for Norwich Taxi. He said the site itself was a good site because it had a wide range. As indicated, Norwich Taxi assumed the Eagle Cab Company agreement and it hoped to utilize the latter's equipment at the tower. A problem that developed in that Norwich Taxi could not use the Eagle Cab Company equipment because the defendant serviced a wider area than Eagle Cab. For four months, Norwich Taxi tried to find a way to use the facility but it could not do so. Apparently, a circuit of some kind could have been run into the tower to provide for Norwich Taxi's needs, but this system was serviced by two different phone companies so if a problem developed the logistics were such that the defendant's communications would be down for a week or two — not a desirable situation for a taxi company. Testimony also revealed that under the licensing agreement the plaintiff did not guarantee the functioning Eagle Cab's equipment; Shoreline just provided space on the tower. In addition, Mr. Knowles testified that prior to assuming the Eagle Cab agreement, his company did not inspect the site. He did not think it would be a problem and did not send his radio equipment people to the site prior to assuming the agreement. But he knew that his company serviced a larger area than Eagle Cab and he even testified that he knew that his equipment needs would be different because of this.
Finally, it should be noted that since the date it receiving payments CT Page 5516 from the defendant, the plaintiff made no efforts to lease the space it had reserved for the defendant to any other party.
The defendant has raised several defenses to the clap made by the plaintiff. It argues for rescission on the basis of mutual mistake; the defendant also states a damage award is not provided for in the licensing agreement and in fact such an award would be "inequitable." The defendant also maintains the plaintiff was obligated to mitigate damages and it took no steps to do so.
 A.
The defendant argues that the contract should be rescinded on the ground of mutual mistake. Buol Machine Co. v. Buckens, 146 Conn. 639
(1951), is cited where the court says: "Rescission of a contract on the ground of mutual mistake may be granted in a proper case where the mistake is common to both parties and by reason of it each has done what neither intended," did. p. 641. This is generally accepted contract law; in the Law of Contracts, Calamari and Perillo, 4th ed., § 9.26 at p. 348, the authors say "Mutual mistake can render a transaction voidable. Where both parties share a common assumption about a vital existing fact on which they based their bargain and that assumption is false, the transaction can be avoided under certain circumstances," cf. MilfordYacht Realty Co. v. Milford Yacht Club, 136 Conn. 544, 548 (1950). The difficult question is what in fact, is a mutual mistake. A classic case is cited in Calamari and Perillo, Sherwood v. Walker, 33 N.W. 919
(Mich., 1887). There, a cow of good breeding stock was thought to be sterile and the owner had contracted to sell it at a much lower price than it would be worth if fertile. Before delivery was made of Old Bess, she was found to be fertile. The court, at p. 923, ruled the contract was voidable "Yet the mistake was not of the mere quality of the animal, but went to the very nature of the thing. A barren cow is substantially a different creature than a breeding one. There is as much difference between them. . .as there is between an ox and a cow. . ." The MilfordYacht case is also instructive, supra. There, the plaintiff had entered into an agreement to sell certain land to the defendant at a set price on a written agreement. After the sale, the plaintiff learned that it had incurred certain tax liabilities; if the plaintiff had known of these liabilities, it would have set a higher sale price so that its stockholders could have earned a better return on their investment. The court noted the defendant had nothing to do with the tax liability and knew nothing of the liability. The plaintiff seller then brought an action to obtain information or cancellation of the executed sale contract or, if neither of these remedies were available, a damage award for loss claimed to have resulted from either mutual or unilateral
mistake. The court found there was no mutual mistake and said at pages CT Page 5517 548-549:
 "There was no mistake on the part of the defendant which influenced or affected it in accepting the offer on the terms submitted. Its object was to purchase at the price at which the property was offered. What the plaintiff might do with the money it received and whether the amount would prove ample to accomplish what it had in mind were not factors in the defendant's conduct. The case does not present a situation where the purchase price was reached upon an agreement that it was to be sufficient to permit the plaintiff to pay its stockholders their invested capital plus a reasonable return thereon. There was no mutual mistake, and the plaintiff was not entitled to a reformation of the contract."
That is in effect what we have here. The plaintiff was under no illusions and had no mistaken idea about what it was in fact offering — it offered for license certain space on a transmitting tower which the defendant's agent himself described as a very good site. When the plaintiff entered into the agreement with Eagle Cab the plaintiff had no reason to expect that that company's equipment on its site could not service the needs of Eagle Cab. In fact, it apparently did. The defendant simply assumed the Eagle Cab agreement with the plaintiff. At the time the defendant did so, the plaintiff also had no reason to know that the defendant could not utilize Eagle Cab equipment and would have every reason to think the contrary. There is no reason to void this contract on the grounds of mutual mistake.
What we have here is unilateral mistake. The defendant mistakenly thought it could use, for its purposes, the equipment it purchased from Eagle Cab when it assumed that company's obligations under the license agreement. Our state does recognize that "unilateral mistake, while never a ground for r formation, may under certain circumstances justify the rescission of a contract," Milford Yacht Realty Co., at136 Conn., p. 549. In Gebbie v. Cadle Co., 49 Conn. App. 265, 777 (1998), fn. 9, the court said: "Our courts frequently look to the Restatement (Second) Contracts for guidance on the law of mistake" and then proceeded to refer to sections in the Restatement dealing with unilateral mistake, §§ 153 and 154.
Section 153 reads as follows:
§ 153. When Mistake of One Party Makes a Contract Voidable CT Page 5518
 Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and
 (a) the effect of the mistake is such that enforcement of the contract would be unconscionable; or
 (b) the other party had reason to know of the "mistake or his fault caused the mistake.
(Emphasis added.)
Section 154 states:
§ 154. When a Party Bears the Risk of a Mistake
A party bears the risk of a mistake when
(a) the risk is allocated to him by agreement of the parties; or
(b) he is aware. at the time the contract is made. that he hasonly limited knowledge with respect to the facts to which the mistakerelates but treats his limited knowledge as sufficient; or
(c) the risk is allocated to him by the court on to e ground that it is reasonable in the circumstances to do so.
(Emphasis added.)
In Comment (c) to § 154, it goes on to say that if party was not only "aware that his knowledge was limited but undertook to perform in the face of that awareness, he bears the risk of the mistake." The defendent certainly "undertook to perform" here; it assumed the licensing agreement and paid for four months.
In this case, Mr. Knowles, who testified for the defendant, admitted that Norwich Taxi did not inspect the plaintiff's facility before signing the assumption agreement nor did it inquire as to what the phone communications would be at the site. He knew that Norwich Taxi serviced a larger area than Eagle Cab at the time he signed the agreement and even indicated that he knew at that time that the defendant's equipment needs would be different than Eagle Cab's because of that.[1] The court CT Page 5519 cannot find for the defendant on the grounds of either mutual or unilateral mistake.
 B.
The defendant also argues that the plaintiff has no monetary damage claim against the defendant because the contract or licensing agreement does not provide for it. The contract was prepared by the plaintiff for its benefit and its language must be construed most strongly against the party who prepared it. Sturman v. Socha, 191 Conn. 1, 9 (1983). Paragraph 9 sets forth clearly the obligations of licensor and licensee — it states upon breach by the license the agreement "shall automatically terminate and licensee shall immediately case use of its transmitting facilities." No other rights are provided to the plaintiff.
Paragraph 9 of the agreement reads as follows:
 9. Licensor shall notify Licensee by certified mail of any breach of any term or condition set forth in this Agreement except for Licensee's or other Licensee's facilities on the premises failure to ensure noninterference with Licensor's facilities, as set forth in, Section 8a, and except for Licensee's failure to render payment, as set forth in Section 3. Licensee shall have a reasonable period in which to cure breach except for breach of terms or conditions set forth in sections 8a or 3. If Licensee fails to cure breach, this Agreement shall automatically terminate and Licensee shall thereupon immediately cease use of its transmitting facilities. Licensee hereby grants Licensor the right to immediately disconnect its equipment and notify Licensee to remove its equipment, in the event that Licensee fails to ensure noninterference with Licensor's facilities, as set forth in section 8a, or in the event that Licensee fails to render payment, as set forth in Section 3. If Licensee does not remove its equipment in sixty (60) days, then Licensee grants Licensor the right to remove Licensees's said equipment.
The defendant cannot be arguing that generally speaking upon breach of a contract, the movant party cannot bring an action for damages unless an oral or written agreement explicably authorizes such a claim. Many contractual arrangements are entered into where the parties do not mention damages because a breach is not contemplated or it is assumed CT Page 5520 that if one of the parties breaches the contract the other party will be made whole. "For breach of contract, the law of damages seeks to place the aggrieved party in the same economic position the aggrieved party would have attained if the contract had been performed," Calamari and Perillo, supra, at § 14.4, p. 543 (4th ed.). Contractual life would come to a halt if parties could not rely on courts to enforce this principal. The right to sue for damages is an important right which is necessary to allow a business to run its affairs in a rational manner so as to intelligently plan its future operations, estimate profits and weigh costs against profits.
Damages are not mentioned in the licensing agreement, but terms can be implied in contracts even if not explicitly set forth. As an 0lder Massachusetts case said:
 "Terms are implied not just because they are just or reasonable, but rather for the reason that the parties must have intended them and only failed to express them. . . or because they are necessary to give business efficacy to the contract as written or to give the contract the effect to which the parties, as fair and reasonable (people) presumably would have agreed on if, having in mind the possibility of the situation which has arisen, then contracted expressly in reference thereto." Barco Urban Renewal Corp. v. Housing Authority, 674 F.2d 1001, 1007 (CA. 3, 1982).
Furthermore, in interpreting a legal instrument, it "is to be construed with reference to all of its language and to its general structure and purpose and in the light of the circumstances under which it was executed. These factors may qualify and control the literal signification of particular terms and phrases as effectively as if express qualifying words were found in the instrument." Radio Corp. of America v. RaytheonMfg. Co., 14 N.E.2d 141, 143 (Mass., 1938).
The language in the agreement stating that if there is a failure to cure the breach, the licensee shall "immediately cease use of (the) transmitting facilities" cannot be interpreted as implying the foregoing of the right to damages — why would it be reasonable to expect the plaintiff would do so and that any licensee would rely on or expect such a result. Rather this language is necessitated by the nature of the service being offered. In other words, although the agreement also gives the plaintiff licensor the right to immediately remove the licensee's equipment upon nonpayment, until it is practical or even feasible to do so a nonpaying licensee could still use the service provided by the plaintiff. If the logic of the defendant's position is carried through CT Page 5521 then, "even in such a case, the plaintiff could not bring a damage claim against the nonpaying licensee. The language relied upon by the defendant — automatic termination of agreement and immediate cessation of use — must be read in context and in light of the following sentence in paragraph 9. It states that in a situation where payment has not been made pursuant to paragraph 3 and its payment schedule, the licensor has the right to exercise self-help to remove the offending licensee's equipment; indeed unlike the situation with some other breaches, a nonpaying licensee under the agreement does not have reasonable time to cure a breach for nonpayment.
Thus the explicit language regarding termination of the agreement and cessation of use of the facility by the licensee can be read as an assertion of the licensor's right to pursue a damage claim where there is continued use of the facility after the licensee has breached because of nonpayment but before the latter's equipment can be removed by the licensor. Also it makes clear to all parties the basis for allowing the licensor to exercise self-help by removing the licensee's equipment from the tower.
The court cannot conclude that the language of paragraph 9 was meant by these parties as reasonable business people to reflect an understanding that no remedy in damages was to be available for breach of a long term licensing agreement.
If such an agreement were breached for nonpayment and the licensee could simply walk away without any financial consequence for its breach, what incentive would the licensee have to abide by its agreement and how could the licensor rationally cover costs and calculate profits? The defendants answer appears to be that licensee's would not walk away from such agreements in the ordinary case since as it argues "it could be reasonably inferred that since companies of necessity need this cell tower they would honor the agreement or risk detrimental financial effects to their company." But the defendant here ran a business relying on communications and it seeks to walk away from its agreement. Apparently then it either does not rely on communications any more or uses a different method of communication with its cabs — that is the whole universe. Also, sometimes failing or poorly run companies might fail to honor agreements even if they were to its advantage or diversified companies might find it profitable to close down certain aspects of their operations for a variety of reasons such as relative profitability. Why should a plaintiff licensor of a service such as this lose a traditional contract remedy of damages if in some situations, not predictable at the time of contract formation, a particular company might not have the traditional incentives need, or ability to use the licensor's services? CT Page 5522
In any event, the court does not believe that the language of the licensing agreements in what it says or does not say can be read as barring the right of the plaintiff to pursue a damage action.
 C.
The defendant also argues that the plaintiff was obligated to mitigate damages. The record is clear that the plaintiff made no attempt to mitigate damages but instead, maintains that due to the nature of the service it provided, it was not obligated to avoid damages. The defendant cites Moore v. Sergi, 38 Conn. App. 829, 843 (1995); Willemetz v.Goldfeld, 171 Conn. 622, 627 (1976); Calamari and Perillo at §14-15, p. 562 for the generally accepted proposition that in a breach of contract action a defendant has a duty to take reasonable steps to minimize damages or to put it another way, a wronged party cannot recover those damages that could have been avoided without undue risk; also see 22 Am.Jur.2d § 495 et seq, p. 578 et seq; Lynch v. Granby Holdings,Inc., 37 Conn. App. 846, 850 (1995) (contract case); Preston v. Keith,217 Conn. 12, 21 (1991) (dicta in tort case).
There is a well-recognized exception to the mitigation of damages rule that is set forth at § 509, pp. 592-93 of 22 Am.Jur.2d.
 "The fact that a reasonably prudent person acting under the facts and circumstances facing the nondefaulting party would have minimized the claimed losses by entering into other contracts with a third party may be shown in reduction of damages. But gains which were or could have been received by the nondefaulting party by entering into another contract or transaction should be used in reducing damages caused by a breach of contract promise only where the breach gave rise to the opportunity to enter into those other contracts or transactions. This rule is often applied when damages are sought for breach of an employment contract. A seller can usually resell goods at a profit, retain the profit and then recover damages from a defaulting buyer, so long as the product was not unique and the seller actually lost a sale. This is the situation if the "lost volume" seller, in which the second transaction is not a substitute for the lost one. A buyer who claims lost resale profits usually must attempt to "cover" (obtain substitute goods) in order to mitigate damages, but in the event that the buyer could have resold both the ordered goods and the substitute goods at a profit, it CT Page 5523 was recognized under pre-UCC law that it may be possible to recover the profit lost on the breached contract. Similarly, a plaintiff who is in the equipment leasing business is not required to again lease equipment repossessed from a defendant that has breached the lease in preference to leasing out other equipment the plaintiff has in his warehouse, in order to mitigate damages." (Emphasis added.)
Also see, Calamari and Perillo, The Law of Contracts, 4th Ed. § 14.16, p. 565. There, the authors say that . . . "if the relation between the parties is such that the wronged party was legally free to enter into similar contracts with others, that subsequent to the breach the wronged party could have or actually has made similar contracts, in no way reduces the entitlement to damages. Thus, for example, if the lessee of automobiles from a car rental company breached the lease, damages will not be reduced by the fact that the lessor leases or could have leased, the automobiles to another. The lessor was free to obtain as many customers as it was willing and able to secure, provided that as a practical matter it could secure additional automobiles for such customers." This exception to the mitigation of damage rule is also referred to in Restatement (Second) Contracts § 350 at comment (d) where it is referred to as the "loss volume" rule, also see comment f to § 347.
The exception does not only apply to sellers of fungible goods. It also applies to suppliers of services or companies licensing equipment; this is made clear in the Am.Jur. quotation previously noted, see underlined portion; also see advertising space cases such as Rishel Furniture Co. v.Stuyvesant, 204 N.Y.S. 659 (1924); Western Grain Co. v. Barron G. Collier,Inc., 258 S.W. 979 (Ark., 1924); Locks v. Wade, 114 A.2d 875 (NJ, 1955). also see the case of Ietz Service Co. v. Salina Properties,865 P.2d 1051, 1054 et seq (Kan., 1993) which contains a thorough discussion of the mitigation of damages rule and the exception to its operation now being discussed. See also Wired Music, Inc. v. Clark,168 N.E.2d 736 (Ill., 1960), suit brought by distributor of music by telephone wire, no duty to mitigate found with court saying, "the evidence is uncontradicted that plaintiff could supply any number of additional customers without incurring further expense except for wire rental."
The fair import of the evidence in this case indicates that the plaintiff operated a three hundred foot tower with numerous space available for other licensees and prospective licensees. The space rented out was not unique, it was just space on the tower. Mr. Quinn testified that if prospective tenants emerged wanting to rent space on the tower that could probably have easily been accommodated and the possibility of CT Page 5524 Spring Broadcasting, for example, coming along with a prospective tenant for the space reserved for Norwich Taxi by the plaintiff was in his words "minimal".
The reason why the mitigation of damages rule should not apply in a case such as this and why the courts have created the exception to the rule being now discussed is set forth quite simply and directly in theWired Music, Inc. v. Clark, case, supra.
"if the defendant's contention (as to mitigation of damages) were adopted by this court, it would have the effect of denying to the plaintiff the benefit of his bargain. This case is no like the situation when a plaintiff has one house to rent or one car to sell or a fixed quantity of personal property or real estate." 168 N.E.2d 738-39.
"The so-called rule of "avoidable damages' if applied in this case, would serve to deprive the plaintiff of the true measure of damages." Id., p. 739.
The court's reading of the cases does not suggest that for this exception to the mitigation of damages rule to apply the goods or services being offered must be of an unlimited or infinite nature, that would abrogate the exception. The spirit of the test to be applied is best set forth in Locks v. Wade, supra, at 114 A.2d pp. 876-879.
 "Where, as here a plaintiff lessor agrees to lease an article of which the supply in the market is for practical purposes not limited, then the law would be depriving him of the benefit of his bargain if on the breach of the agreement, it required his claim against the lessee to be reduced by the amount he actually did or reasonably could realize on a reletting of the article. For if there had been no breach and another customer had appeared, the lessor could as well have secured another such article and entered into a second lease. In case of the breach of the first lease, he should have the benefit of both bargains and not — in a situation where the profit on both would be the same — be limited to the profit on the second of them." (Emphasis added.)
The court is of the opinion, then, that according to the above reasoning and applied to the facts here the plaintiff had no duty to mitigate damages.
But even if the court's analysis is incorrect, and the mitigation of CT Page 5525 damages rule applies, there is reason to conclude that the plaintiff cannot take advantage of its operation in this case. In a tort and a breach of contract action the defendant bears the burden of proving that the defendant exercised reasonable care to mitigate damages. Lynch v.Granby Holdings, Inc., 37 Conn. App. Supra at p. 850. In Preston v.Keith, 217 Conn. 12 (1991), a tort action was involved but the court indicated its reasoning would apply to breach of contract cases and theLynch court so interpreted Preston, see Lynch at 37 Conn. App. p. 851. InPreston, the court noted that the burden to show mitigation was on the defendant and quoting from a commentator said the defendant to prevail on this defense "must show that the injured party failed to take reasonable action to lessen the damages; that the damages were in fact enhanced by such failure; and that the damages which could have been avoided can be measured with reasonable certainty." 217 Conn. at p. 22.
Here, the defendant was able to show that the plaintiff took no action to lessen the damages but no evidence was introduced by the defendant to show that in fact a pool of prospective licensees was available to take the space on the tower rented by Eagle Cab and assumed by the defendant. There was no evidence of an established market for this type of service with generally accepted prices. As the Restatement (Second) of Contracts indicates in § 350 comment (c) where there are no well-established markets "the burden is generally put on the party in breach to show that a substitute transaction was available . . ." No such evidence was offered here so that the court cannot apply the mitigation of damage doctrine to reduce the damage claim even if it were held to be applicable.
 D.
The defendant also argues that awarding contract damages would be inequitable. That is, the defendant would pay damages and not have use of the site. In its brief it is argued that "the plaintiff's successor could easily license the site formerly occupied by the defendant to some future licensee. This would be tantamount to a double recovery to the plaintiff (and its successor)." The plaintiff counters by saying under the terms of the agreement it has with the successor purchaser no double recovery is possible since "the only individuals who could regain the space on the tower were Eagle Cab or Norwich Taxi should they cure their default on the license agreement."
The court questions whether the plaintiff need go that far. In all of these "lost volume" cases where the mitigation of damage rule does not apply the plaintiff is entitled to recover for the loss of its bargain that is its lost profit. The plaintiff seller of the fungible product such as an automobile or a service is not prevented, after the breach, CT Page 5526 from selling the product or service to someone else. That is the whole point of saying the mitigation of damage rule does not apply. In any event, what happened "in the marketplace" here should instruct a court as to the economic realities of this type of business and the recognized monetary effect of a breach according to common understanding of business people in this industry. The uncontradicted testimony was that when the plaintiff sold its business to Spring Broadcasting it accepted a reduction in the sale price to reflect the actual loss of profit resulting from the defendant's breach. Where is the double recovery for the plaintiff? The agreement between the plaintiff and the purchaser, Spring Broadcasting, in effect has meant that the latter company could not sell the space reserved for the defendant to another customer — where is its double recovery? In effect, the agreement between Shoreline and Spring Broadcasting to reserve space for the defendant after the breach modified the agreement in the defendant's favor by relaxing the provision in the licensing agreement to the effect that for breach because of nonpayment, the licensee would not have a reasonable time to cure. It would be an odd turn of events if this reservation of space for the defendant could now be used as a means to deprive the plaintiff of its right to damages.
 E.
The court finds in the plaintiff's favor and awards damages of $12,600 which represents the amount of monthly payments due from November 1, 1999, the date of breach through the end of the term of the license. The court also believes prejudgment interest in the amount of $273.92 should be awarded to the plaintiff for the wrongful breach of the agreement pursuant to § 37-3a of the general statutes as interpreted byAssociate Catalog Merchandisers, Inc. v. Chagnon, 210 Conn. 734, 748 (1 989).[2]
 _________________________ Corradino, J. Date